Here to eat, here to eat, Mr. Honorable Howard Morton of the 2nd Judicial District, is now back in session. The Honorable Christopher M. Kennedy, tonight. Good morning, please be seated. Your Honor, the second and final case on the topic this morning is 2-44-0246. The people of the State of Oklahoma want to claim the evidence of fault, the benefit of the doubt. The Honorable William Gaffney McConnell, Mr. Barry Spivak. The Honorable William Gaffney McConnell, Mr. Adam Varughese. All right, good morning, Counsel. Mr. Spivak, you may proceed when ready. Good morning, Your Honors. Barry Spivak, representing the appellant in this case. This case, as Your Honors obviously know, is a denial from a petition for post-conviction relief. There was a previous appeal on this matter. There was a previous appeal on this matter. I wanted to start, though, by noting that my brief said that we had moved to supplement the record with a transcript from April 28th, something like that. And preparing over the weekend, for some reason I couldn't find a stamped copy. And I grew alarmed that maybe I said something about a polybrief that turned out not to be true. It doesn't affect our argument at all. We thought it was irrelevant. But if it isn't in the record and the court wishes, we can move to supplement it at a later time. But it doesn't affect my argument. I just didn't like the idea that I said that we had filed a motion and then couldn't find it. So anyway, moving on from there, there's basically two major issues in the case. And one is, did the state advise Kevin that there had been a direction in another case to compare the DNA of an unknown male to this person in some other case? And if the state did not indicate to Kevin that this request had been made to compare the DNA, was that a Brady violation? Regarding the first issue, whether the state advised him that there was a male contributor that had apparently committed an offense that was very similar to the offense that Kevin was being charged with, Kevin's attorney testified unequivocally that she did not receive anything to indicate about this fellow Stoga. And through the course of the proceedings, the name of Stoga never came in. It was only talk about an unknown male. And in the past eight years, Defendant's counsel no longer had what was originally provided to him with respect to the other case. And just stated unequivocally, counsel said that there was nothing about this Stoga in the information that we got in our case. Did anybody ever subpoena the state's original 417 packet for a defendant that was produced in 2018? I don't... The state, I think, produced what they said was a packet. I think it was unclear whether there was an original... on hard copies. It was just handed out to the copies according to the court record. And... So the issue in this case, the big issue in this case, of course, for your Brady violation is this, the forensic reports. Whether or not there was a match. You're saying whether or not you got it. There was never a match from Stoga with the DNA profile of the victim, was there? There was never a match, but I think there was never an effort to find out if there was a match. It's interesting, I remember when you look at Wright's testimony. Yeah, Wright's testimony. Yeah, and she stated, I did not ever do a direct comparison between the standard from J15, that would be the defendant's case, to the unknown. I did not do a direct comparison from the standard in the J17 case that would be Stoga to the unknown profile in the J15 case. So did the CODIS ever match? When they put it through CODIS, he never... It was never a match, correct? Subsequently, they said it never matched. Correct. But they never did an actual test to determine whether there was a connection between the two of them with the DNA. We never did a... I'm sorry. Let me ask you this question. If the issue at trial was consent and not identity, why is identification of the unidentified male profile exculpatory? Because it could show... It would be reason to indicate that she was confused about things, that her testimony was not completely accurate. It would show that something else was going on with her. But she never... There was never a match with Stoga. He was kind of a totally different case. There was never a match, Your Honor, but that's because they didn't try to find out if there was a match. There was some reason, Judge, Your Honor, that they said, compare these two cases. That didn't come out of the blue. There must have been a reason for why there was an indication to compare these two cases. And it doesn't appear... I'm sorry. No. Didn't Wright testify as to that? I mean, they were in... Written at that time, then they moved to... That's what she said. It was unclear, though, whether, you know, when it was written into the... When it was put into the one master file where both cases were put into it. She didn't know when it happened. But I still think, you know, the key is, you know, the testimony that you just read. I did not do a direct comparison from the standard in the J17 in Stoga to the unknown profile in the J15. So it was not done. But when it was entered into CODIS, basically it said that this was not a match. There were... That's what it was. No one said there was a match. Right. So how's it relevant? Yeah, no one said there was a match. How's it relevant? It's relevant because the fact is we should have been known, we should have been told that there's a reason to suspect this person, Stoga, as having been the person that may have committed this crime. And that could have been investigated by the defense. And perhaps they were wrong. If it were investigated, we now know what the outcome is. The outcome is there's no match. I don't agree with you, Your Honor, most respectfully. Really? Yeah, the reason I... How would there be a match when the CODIS showed that there was no match? Because there was no comparison that was really done with the standards. Okay. It wasn't done. The fact that there is a CODIS hit then gets you perhaps to the next step, which is to determine whether there is a match with the DNA, and that was never done. So I don't think that, you know, that is why there is still a violation. So... But, again, whether or not she had sex with someone else doesn't prove consent, does it? Whether he had sex with someone else does not necessarily prove consent, but it goes to her credibility. Because remember, she didn't even remember anything with him that night. That's correct, yeah. And so she could be confusing him with this other person who actually committed a forcible felony on her. But that's not what she said. She said when she woke up, she was in bed with your client. Right, but there also was an indication she may have been in bed with other people that night, too. So that still would have been a defense the defendant could have raised. But he said... Okay, okay, I get what you're saying.  Okay. Yes, Judge. So... Let's talk about the ineffective assistance claim that you're making. Well, that was the defendant's trial attorney said, if I was told that there was this potential match or, you know, they should compare it with this fellow Stoga, then I was ineffective by not following up on it. And I would suggest that's clear because, in fact, one of the things the defense wanted to do was to try to, like, find out who else might have gone to the complainant's condo or house that night from the parlor. You remember at least one person said... At least one guy said he did. And then there was another person who said, I'm not going to let him test my DNA unless I'm the same person. But you're exactly right. So, you know, there was other things that maybe would have shown that this other person might have been the person who had molested her that night. And it wasn't. Okay. Okay, she said she was passed out. Yes. Your client said, I had sex with her and it was consensual. Yes. Isn't that the issue right there, whether or not it was consensual sex? The issue is whether she, obviously, whether she could consent. Yeah. So whether she could consent with your client who agreed that he had sex with her, how's it relevant that somebody else might have sex? But then it goes to her credibility as to whether she... She's a tramp? I would never say something like that. No, but that's why you don't let that stuff in, isn't it? Well, but here you've got a situation where, for some reason, authorities thought this should be compared to... There was a second male, okay, whether it was Stoga or someone else. Apparently, there may have been... She may have had sex with two people that night or I think the DNA can stay in there for longer than 12 hours. I think it was 72 hours or something. But she apparently had sex with two different people over a very short period of time. I don't think that makes someone a tramp, but that would be what would cause the confusion. Okay, let's talk about the ineffective assistance with respect to the DCFS reports. That's a big portion of your complaint. And Mota testified that she tried to bring a lot of this stuff in and she was denied. So if she tried to bring it in because after the state filed the motion to eliminate, she told the court she had a motive to lie. She was risking her custody, et cetera. How was she ineffective? Well, because that is the part where she was ineffective. She was ineffective with respect to not following up on the fact that there was this potential other individual who may have committed the offense and maybe even had evidence about what happened that night. But are you saying that you didn't raise ineffective assistance as a result of the custody issue? We raised it all together with both of those. But that was the main thing, is with respect to the DNA. Okay. Well, I guess my question to you, then, how is it ineffective if there was a motion in Lemonade to bar any questions about custody issues and Mota argued against the motion? How is she ineffective? Again, Judge, with respect to that, it's hard for me to say. The ineffective that I'm relying on is with respect to the comparison, the DNA, whatever you want to call it. Did the victim lose custody of her children because of the events the night of the party? Do you know? I don't know. Well, there was some testimony about that when this one fellow, Vokun, I think his name was, testified. I don't recall what he said about it. But so I don't know. I mean, it wasn't an issue in the case with respect to the criminal case against Kevin. You rely on the Beeman case for the material coming in, the theory of your case concerning the consent. You rely on Beeman. But isn't Beeman a case that was really circumstantial evidence in a murder case? How is that like this case here? To me, this was also, you know, maybe it's not necessarily circumstantial because you could have witnesses, obviously. And you have DNA. Yes. Well, I'm not sure you have DNA. You know, I don't agree with you there with respect to there being DNA. You don't have DeBolt's DNA? Oh, you have DeBolt's DNA, yes. But you still don't know what went on in order to whether there was actually sexual assault or whether there was consensual sex. So I think that becomes the difference, you know, because it still could have been, as DeBolt testified, consensual sex. So, you know, the defense, as I say, you know, really wanted to do a – would have done something, I think, with that stolen evidence had the defendant had it. I think it's the fact that no one ever talked about it until after the trial indicates that it wasn't given to the defendant prior to the trial or in discovery. And that, in fact, it looks to me as though no comparison was ever made. I think there was, therefore, a grave violation in not letting the defendant know about Stolga. And for that reason, we're asking your honors to reverse the decision of the trial. Counsel, did the trial court find that the attorney received the 417 packet prior to trial? Yes. And I think the defense never denied that. And that's why I think I may have been confusing. The defense admitted that they received the 417 file. The issue was whether this information was in the 417 file. Whether it contained the Stolga information. Exactly. And whether it was a 2018 417 packet. Yeah. Exactly. That was what was confusing about it. I have one other question. You argue in this post-conviction petition that the trial court errored in the ruling on the motion in 1A with respect to the custody issues with the child. Did you ever raise that argue on direct appeal? I would have to check, Your Honor. I'll be honest with you. Okay. All right. You will have time in rebuttal. Thank you, counsel. Thank you, Judge. Ms. Rodriguez, you may proceed when ready. Good morning, Your Honors, counsel, and may it please the court. The post-conviction court did not manifest the error when it determined after the third stage evidentiary hearing that no Brady violation occurred in this case. Let me ask you a quick question while we're talking about it.  Was Heather Wright's conclusion, her August 15, 2020 report, where she concluded that Stolga was excluded as a possible unidentified male sample in defendant's case, was that based on the 2017 or 2018 CODIS analysis, or did she conduct new DNA testing? She did not conduct new DNA testing, Judge. She testified at pages 1917 to 1918 of the record that she merely did a comparison of the prior existing standard of the Stolga case with defendant Diebold's case. There was no additional new forensic testing performed in this case. And her testimony also established that she merely made a comparison based off these two cases, which had entered the CODIS system at some point in 2017 and 2018. And I think it's actually fairly critical to defeating defendant's argument that the Stolga defendant's case was the last in time. That occurred in 2018. Defendant Diebold's sample already entered CODIS back in 2015 and 2016. Therefore, as this Court is well aware of the way CODIS works, you enter in a sample. If it then identifies that there is a match within the system, that pings notice for subsequent forensic testing. So when defendant Diebold's sample, which was already in CODIS, and defendant Stolga's sample was entered subsequently, if there was any forensic connection between the two, there would have been a CODIS hit there. And Ms. Wright testified that the absence of a CODIS hit indicates there was no forensic connection. In addition to her testimony that these cases were absolutely not forensically linked in any way, and that defendant Stolga was positively excluded as the source of that second unknown DNA profile. In regards to the first point, nobody violation occurred in this case because the people disclosed all of this forensic evidence pre-trial. On April 11, 2018, the people issued a subpoena to Stechem, to ISB, for defendant's 417 packet. On April 27, 2018, a signed pre-trial status order indicated the court had received the 417 packet and entered it in open court. Was Stolga information in there? Judge, I would say that there is no basis in the record to claim otherwise. And defendant's argument sort of implies that somehow there was information that was removed from that packet. I think that's a rather fantastical argument to make. Especially because, as this court is well aware, 417 packets are sent to the court. They return, the court says, I have two identical envelopes, here you go parties. The claim that somehow the information of Stolga was not in the 417 packet that was tendered on April 27, 2018, it's just fantastic. Is your argument the absence of evidence is not evidence of absence? No, Judge. My argument is a bit more nuanced because we're at the third stage PC proceedings. So it's defendant's burden at third stage to establish the constitutional violation. And as this court is aware, at third stage, defendant is no longer entitled to the presumption. Well, in this case, isn't there an absence of evidence to the extent that we're not sure what was in the packet? I would say yes, insofar as that no one ever indicated, hey, here is the 417 packet. But at third stage, defendant's not. On a more elemental level. I'm sorry? On a more elementary level. Was it or was it not in the packet? My position is that it was in the packet, Judge, and there's nothing in the record to indicate otherwise. And furthermore, at third stage, defendant's not entitled to the presumption. And it's the other side's contention that it was. Sure, Judge. I think ultimately we're going to have a. And so absence of evidence is not evidence of absence. Sure. But that's not the only basis upon which the State argues that the 417 packet zero is in there. That is the logical response to your argument about the lack of evidence or a lack of certainty as to whether or not there was, in fact, this evidence included in the packet. Sure. Mrs. Wright also testified at the post-conviction hearing that that information would have been contained in the 417 packet. Was it ever subpoenaed? Did the defense ever subpoena the State's original 417 packet? They did not, Judge. They did not. The people did, during the middle of this post-conviction proceeding, subpoena the information, and then Mrs. Wright testified everything that was contained within the 417 packet would have been there. She testified that based on how ISP was handling 417 packet material in their internal record, keeping procedures, that they both would have received a paper copy as well as a hard copy when ISP was transitioning to a database system. So there's absolutely no indication in the record that this information was not included. On this point, defendant argues, you know, or it is the people's argument, that the State disclosed all the forensic data. Defendant's argument amounts to a complaint that the State didn't disclose a factual conclusion regarding that data. But Brady doesn't require the State to disclose factual conclusions supportive of a particular defense theory. Indeed, to follow defendant's argument, Brady would then require the State to disclose the absence of a CODIS hit between the defendant's profile and all of the information in the CODIS database. Yet that, the absence of a CODIS hit in the system, would never constitute exculpatory evidence, either, excuse me, would never constitute favorable evidence, either exculpatory nor impeaching, nor would it constitute material evidence under Brady. So defendant's argument regarding the lack of disclosure fails at a fundamental level when you really break it down and look at what he's, in fact, arguing. Your Honor, I was asking a second point. The information regarding the stolen defendant was not material evidence under Brady. Consent, not identity. How did they get in the file? I believe there was a handwritten notation in the stolen defendant's file which referenced the default defendant. And I would note defendant, in his brief, frames this as, you know, the ISP or police were ordering testing. Courts order testing. Police and prosecutors request testing. But the simple fact that there was a handwritten notation from an officer which Ms. Wright's testimony at the Third Stage Adventure Hearing established was not hers, does not establish a forensic link between the default defendant and the stolen defendant. So the mere reference of a case citation could have occurred for a number of innocuous reasons. Perhaps since the stolen defendant's case was the last in time, there was an officer who thought, hey, these cases might be similar. They pricked his ear and he put in a notation. But that simple act does not establish a forensic link. And as we know, there was no forensic link. So this argument sort of, again, falls apart when you apply simple logic. Counsel, could it have led to an investigation along other lines that did not depend strictly on a consent defense? No, Judge. Consent non-identity was always the defense. So a second unrelated DNA profile would never have been relevant to that argument or that defense. And simply put, an additional subject is not an alternative suspect for purposes of this crime. The information related to the stolen defendant does not exculpate defendant from sexually assaulting the victim without her consent. In fact, defendant just wants to freeze in time his Brady claim and ignore everything that was fleshed out at the evidence you're hearing. Not only is that claim refuted by the PC court's factual findings, but it also seeks to improperly hold on to that presumption that defendant's petition and the allegations in his petition and the accompanying affidavit are true for purposes of the third state proceedings. But as this court is well aware, case law says he is no longer entitled to that presumption. Just when in the original, in the trial, the trial court allowed defense to ask the victim, did you have sex with anyone else that night? And she said she didn't remember having sex with anyone. Correct, Judge. Okay. And, you know, the evidence also established that defendant's DNA profile was a contributor to the mixture, and this right further testified that the statistical probability that a random unrelated white individual would coincidentally have the same DNA profile as defendant's was approximately 1 in 2 billion white unrelated individuals. As such, that forensic evidence overwhelmingly established it was defendant's DNA that was found in the victim's vagina. Therefore, because of the strength of that evidence, defendant could only proceed with consent defense. Indeed, how could he proceed otherwise when, in addition to that DNA evidence, the victim testified that while in her bathroom, the defendant entered and twice told her to perform oral sex on him. She also testified that she did not recall any other males other than the defendant being in her bedroom, and that when she woke up in the morning, defendant was asleep in her bed. And that's at paragraph 679 of this court's decision on direct appeal. Furthermore, the victim's neighbor, Ms. Newcomer, testified that she saw the defendant in the victim's home the first and third times that she visited the victim's home to check on her. And, in fact, on that third time, she observed the defendant sleeping in the victim's bed. That's at paragraph 20 of this court's decision. The neighbor. The neighbor, Ms. Newcomer. And she further testified in her testimony corroborated the victim's daughter's testimony about the defendant being wet because she indicated he had entered her home at some point in the night during the party wearing a towel due to his clothes being wet, which was consistent with AZ, the victim's daughter's testimony, that she observed the defendant coming out of the bathroom. She also saw the defendant multiple times throughout the night in and around their home, outside of the door, in the hallway. She testified that the defendant brought the victim into the bathroom to help her while she was vomiting, and that she subsequently later on observed him sleeping in her mother's bed, and later the next morning leaving the mother's bedroom wearing pajama pants. So, therefore, despite, you know, all of this evidence placing the defendant in the victim's bedroom, the defendant claims that the information related to the Stilgo defendant could have been used to argue an alternative suspect theory. But, again, that argument, you know, falls apart, and it fails for three critical reasons. One, the source of the second DNA source would be precluded by the rape shield statute, and there's absolutely no indication in the record that Stilgo lived anywhere near this victim or he was in any way involved. And I would note... How about Galanti? I believe he was sleeping in Ms. Newcomer's home. There was testimony that he had visited Ms. Newcomer or entered the victim's apartment during one point in time, but the victim's daughter and the victim both identified the defendant as the sole person repeatedly entering the home, repeatedly being near the home. So the testimony, in addition to the forensic evidence, slowly puts the defendant in the victim's bedroom. Therefore, given the forensic evidence as well as the witness testimony, how could the defendant have presented an identity-based defense to a jury? That would have been professional suicide, and I would argue that would have been deficient performance. Given this evidence, the only defense that the defendant had available to him was a consent defense. That explained away why he was in the victim's bedroom, and it also explained away why his semen would have been found in the victim's underwear. But ultimately, as we know, that was not the case. And the evidence in the jury found that it established the victim was sexually assaulted without giving consent. You said there were three reasons, the first being Raymshield's statute, and what were the other two? Yes, Judge. By the defendant's own admission, he allegedly, you know, had consensual sex with the victim. Thus, the information related to his second source wouldn't be germane to that issue, nor would it absolve him from committing the crime. And at most, the information, if believed, would support the inference that the victim was sexually assaulted twice, not that the defendant did not sexually assault the victim. Thus, there is no reasonable probability that had the evidence of the second unknown male DNA profile been disclosed to the defense, the result of the proceeding would have been different. Your Honor, as I said, the defendant's DNA was also not favorable evidence under Brady, where it was positively excluded. I think we've talked about that, so I won't belabor that point there. Just merely evidence under Brady is favorable if it's exculpatory or impeaching. The fact that an unrelated third party's DNA was positively excluded would in no way be favorable or in any way exculpatory or impeachment evidence for purposes of this case. As I indicated in this right, emphatically testified during the evidentiary hearing that there was no forensic connection whatsoever between the two cases. Therefore, the sole basis of defendant's Brady claim was the affidavit of Dr. Reich appearing that Stola defendant's DNA profile matched the second unknown DNA profile contained in the J-17 ISP case file, which he characterized as a correlation-slash-linked, i.e. case-to-case hit. However, PC Court's, excuse me, PC Counsel conceded in this right confirmed that there was no CODIS hit existed between defendant's case and the Stola defendant, despite Dr. Reich appearing to the contrary. And ultimately, the doctor's affidavit was withdrawn. So therefore, the sole basis upon which defendant could even allege his Brady claim fell apart at the post-conviction hearing. Thus, the information related to the Stola defendant, which was excluded, would not constitute favorable evidence, either exculpatory or impeaching, for purposes of Brady. How do you distinguish the Beeman case that defense relies on in their brief? Sure. In Beeman, the Supreme Court found a Brady violation where the state withheld police reports about another suspect, Murray, who both had more of an opportunity to commit the murder in that case and who was unaccounted for during the time of the commission of the offense. Because the prosecution's case was weak and circumstantial, the court held that undisclosed evidence of a viable, and I emphasize viable, alternative suspect was material, as it could have changed, undermined the credibility of the investigation and altered the outcome of the trial. Unlike Beeman and the other case former defendant cites, there was forensic evidence in this case, which not only linked defendant to the crime, but, as we know, positively excluded the Stola defendant. Moreover, through both his consent defense and witness testimony, defendant was identified and placed in the victim's bedroom. Therefore, based upon that, there was no basis to challenge the investigation when defendant himself conceded and, you know, represented that his affirmative defense would be won based on consent, therefore putting himself in the bedroom. Beeman's limited to identity cases where there's a viable alternative suspect. There's nothing tied Stolga to this case. He was positively excluded. Forensically, there's no indication that he lived there. In fact, if you look at the information that counsel supplemented in the record, Stolga lives over 40 miles away, several towns over southeast in Elmwood, Illinois. This offense occurred in Yorkville. Therefore, there was no viable alternative suspect in this case. For those reasons that I've argued today, as well as those in our brief, the people ask that you affirm the denial of the defendant's post-conviction petition following the third-stage evidentiary hearing, if there are no other questions. Thank you, counsel. Thank you. Mr. Spivak, rebuttal. Thank you, Your Honor. Briefly, the issue is whether the State advised or the defendant was advised of this person, Stolga. And there is, as defense counsel testified, knew nothing about this Stolga. That was the testimony, that they knew nothing about this Stolga person. And when they talked about issues in the case, no one ever said Stolga was always this unidentified male. So no one identified anything with Stolga. If that had been identified, it could have been followed up by the defendant, because maybe the State is wrong, ultimately, if they thought that there was some connection. But at least it could have been investigated. The defendant would deny the opportunity to investigate this alternative person, who someone had said, compare these two files. Now, with respect to whether there was or was not a comparison, I repeat what I said in my initial argument, that Wright said, I did not do a direct comparison from the standard in the J17 case to the unknown profile in the J15 case. So it was not done. And it was no, it was simply not done, even though it should have been done. Thank you. Counsel, if we assume, let's just assume for purposes of argument that a direct comparison is done, and Stolga comes up as a match, what difference does that make, given that it was a consent defense? Because, obviously, she's saying something different. So she could have been saying something with respect to something that happened with this fellow Stolga. Well, there's something she didn't remember. Pardon me? She didn't remember his statement. Right, but he's entirely, he can still say that he had consent with her, but it wasn't like a sexual assault case. Yeah, that's what he's saying. But she's saying, I was so drunk, I was passed out, I didn't remember having sex with anybody. So it doesn't come down to her whether she, well, it comes down to her versus him, but it doesn't come down to her with how many men did you have sex with. She said, I could have had sex with 20 men. I don't remember. Your client is saying she gave me consent to have sex with her, and she's saying I didn't get consent because I didn't know I was out of it. So how is that relevant? The issue is consent. The only way that, to me, that it would be relevant for the defense would be to show that she was a loose woman and had sex with a lot of men. How is that relevant? It's relevant that she had sex with at least two men that night, and one of them, we believe, was this fellow Stolga, and that could have been led to good evidence with respect to whether there was consent or lack of consent with respect to DeBolt. Okay. Thank you. Thank you very much, counsel. Thank you. Appreciate the arguments. Counsel, we will take this case under advisement into a ruling in due course, and we will adjourn for the day. Thank you. All rise.